**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

SHANNON WILLIAMS,        )
                           )
        Plaintiff,    )
                           )
v.                        )       **No. 10-2305-STA-tmp**
                           )
REGIONAL ADJUSTMENT BUREAU,  )
                           )
        Defendant.    )

---

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Before the Court is Defendant Regional Adjustment Bureau's Motion for Summary Judgment (D.E. # 17) filed on January 27, 2012. Plaintiff Shannon Williams has filed two responses in opposition to Defendant's Motion (D.E. # 21, 33), and Defendant has file two separate reply briefs (D.E. # 22, 37). For the reasons set forth below, Defendant's Motion is **GRANTED**.

## BACKGROUND

### I. Procedural History

Plaintiff filed suit *pro se* in this matter and in *Williams v. Regional Adjustment Bureau*, no. 10-2306-STA-tmp, a companion case which was consolidated with this case for all further proceedings.[1] Plaintiff continued to represent herself through May 11, 2012, at which time counsel for Plaintiff filed a notice of appearance (D.E. # 23). By that time, Defendant had already filed the instant Motion for Summary Judgment, Plaintiff had responded *pro se*, and Defendant had filed a

---

[1] *See* Order Consolidating Cases June 29, 2010 (D.E. # 4).

1

reply brief. Upon retaining counsel, Plaintiff filed a motion to modify the schedule (D.E. # 24), essentially seeking to re-open discovery for the purpose of responding to the Rule 56 Motion. Pursuant to an order of reference, the United States Magistrate Judge denied Plaintiff's motion on July 19, 2012, but did grant Plaintiff an opportunity to file a new response brief prepared with the assistance of counsel and Defendant an opportunity to reply to that brief. Plaintiff filed her counseled brief on August 20, 2012, and Defendant filed a second reply brief on September 6, 2012. In light of the fact that Plaintiff now has counsel and the parties have filed a second round of briefs, the Court will not consider Plaintiff's *pro se* brief or Defendant's reply to that brief. The briefing having now been completed, Defendant's Motion is ripe for adjudication.

## II. Factual Background

The following facts are not in dispute for purposes of this Motion unless otherwise noted. Defendant is a collection service business located in Cordova, Tennessee. (Wyatt Aff. ¶ 2). Plaintiff began her employment with Defendant on August 20, 1997, when she was hired by Patti Martin ("Martin"). (Wyatt Aff. ¶ 2; Williams Dep. 41:11-15, 42:14-16, Nov. 4, 2011; Martin Aff. ¶ 2). Plaintiff was hired for no definite term or duration and was at all times an employee-at-will. (*Id.*) Plaintiff began her employment as a collector with the responsibility to make telephone contact with individuals who owed debts to Defendant's customers and then to attempt to have them pay their debts. (*Id.*). The position was competitive and stressful because if the collector did not meet targets, he or she could possibly lose the job. (*Id.*)[2]

---

[2] In her responses to Defendant's statement of undisputed material facts, Plaintiff admits this job description for the position of collector but asserts that it is not material to the issues presented at summary judgment. Plaintiff argues that she was not terminated for failure to meet her target numbers. Plaintiff's point is well-taken; however, the Court will include the characterization of the collector's job here, though it may not be entirely relevant to the Court's

In the summer of 2001, Plaintiff was promoted to Unit Manager, a position in which Plaintiff helped supervise the five to ten collectors assigned to her unit. (Williams Dep. 41:13-19; 43:2-7, 81:24-82:4; Martin Aff. ¶ 3; Wyatt Aff. ¶ 2). In addition to the supervisory responsibilities, a Unit Manager also has responsibility to work on the telephone as a collector. (*Id.*) Unit Managers effectively recommend discipline and discharge but are not authorized to administer it. (*Id.*) Defendant maintained four collection departments in all: Capital One, student loan, legal, and retail. (Williams Dep. 40:21-41:1; Wyatt Aff. ¶ 3; Martin Aff. ¶ 4). Each department had a Collections Manager. (*Id.*) Due to its relatively larger size, the retail department had an Assistant Collections Manager. (*Id.*) In the management hierarchy of the company, Unit Managers such as Plaintiff reported to Shift Managers, Shift Managers in turn reported to Collection Managers (or in the case of retail, the Assistant Collection Manager). (*Id.*)

Patti Martin became Collection Manager in the retail department in 2003. (Wyatt Aff. ¶ 4; Martin Aff. ¶ 5). From that time until Plaintiff's termination on November 4, 2009, there were no job openings for the position of Shift Manager in the retail department. (*Id.*) Plaintiff disputes this assertion, arguing that Defendant had such openings but simply did not post them in an effort to prevent African-American females from applying for them. (Williams Aff. ¶¶ 2, 3.) Plaintiff adds that Defendant "re-branded" the position of Shift Manager with the new title of Turnover Specialist, though the job duties of the two positions were essentially the same. (*Id.*)

Until August 11, 2008, Shelly Hopkins-Harper held the position of Shift Manager in the retail department. (Martin Aff. ¶ 6). According to Defendant, following Harper's resignation, her position as Shift Manager was eliminated, and her duties were divided between the remaining Shift

analysis of the issues.

Managers.  (*Id.*)  Plaintiff avers that the position was re-classified as "Turnover Specialist." (Williams Aff. ¶ 2.)  Defendant states that the position of Turnover Specialist was created in 2009. (Wyatt Aff. ¶ 5; Martin Aff. ¶ 7.)  Plaintiff admits that Defendant began using the title Turnover Specialist in 2009 but claims that the position was in existence for some time before then.  (Williams Aff. ¶ 2.)  A Turnover Specialist works directly with collectors and literally moves from one collector's desk to another, speaking with debtors the collectors have made contact with on the telephone and assisting in the collection effort.  (Wyatt Aff. ¶ 5; Martin Aff. ¶ 7.)  Defendant claims that Turnover Specialists had essentially the same authority as a Unit Manager and were not in any way treated or paid like Shift Managers.  (*Id.*)  Plaintiff contends that unlike Unit Managers, Turnover Specialists were not required to meet personal collection goals.  (Williams Aff. ¶ 2.)

It is undisputed that Collections Manager Patti Martin and Plaintiff had a good working relationship for most of Plaintiff's employment.  (Williams Dep. 45:10-46:4; Martin Aff. ¶ 8.)  Over the years, Martin had several one-on-one meetings with Plaintiff.  (Williams Dep. 55:11-56:8; Martin Aff. ¶ 8.)  During the course of those meetings, Martin advised Plaintiff that if a Shift Manager position became available, she should consider moving up. (*Id.*)  Defendant claims that until the resignation of Shelly Hopkins-Harper in August 2008, Plaintiff had always indicated that she was happy where she was and did not want the responsibility of the Shift Manager position.  (*Id.*)  Plaintiff responds that Defendant did not post the opening for the Shift Manager position when Harper was first promoted to that position, though Plaintiff does not state when that occurred. (Williams Aff. ¶ 3.)  Plaintiff asserts that had Defendant posted the job, she would have applied for it.  (*Id.*)  Plaintiff adds that when Harper resigned, Defendant did not post the opening and instead retitled the job as Turnover Specialist and hired two males for the position.  (*Id.*)

4

Martin commonly reassigned a client to a different Unit Manager when collections on a particular client were down. (Martin Aff. ¶9; Williams Dep. 89:13-19.) Plaintiff felt her job was not secure because Martin would threaten Unit Managers with termination. (Williams Dep. 141:5-12.) In September 2009, Martin observed that collections for the Citizens Bank Student Loan account were unacceptably low. (Williams Dep. 92:7-24; Martin Aff. ¶ 10.)[3] Martin's assessment was confirmed by the client's score card received in October 2009, showing Defendant in last place in the competition with other agencies for the business. (*Id.*) Plaintiff had been assigned this client since about May 2009. (*Id.*) In mid-October 2009, Martin decided to move Plaintiff to the Honda/Nissan Unit and give another Unit Manager a chance to improve Defendant's performance on the Citizens Banks Student Loan account. (*Id.*) Martin's motivation was to improve collections on the account, as she perceived that Plaintiff was not getting the job done, threatening Defendant's ability to hold onto the client. (*Id.*) Plaintiff adds that she was assigned the Honda/Nissan account, which was performing poorly and which the client had threatened to pull from Defendant unless collections improved. (Williams Aff. ¶ 4.) According to Plaintiff, Thomas Spencer was the Unit Manager for the Honda/Nissan account, and Defendant reassigned him to the Citizens Bank and Fifth Third accounts. (*Id.*)

Following the client reassignment on October 14, 2009, Plaintiff expressed interest in a Shift

---

[3] Plaintiff adds that she met her quota for this account for three out of four months. However, the Court finds that the record evidence Plaintiff cites does not actually support this proposition. Plaintiff's summary judgment affidavit does state that she managed the Citizens Bank Student Loan account for about a year and that the account was profitable. Williams Aff. ¶ 4. Plaintiff does not actually dispute Defendant's contention that collections on the account were "unacceptably low" or the evidence that Defendant placed last among collection agencies working these accounts.

Manager position in 301 or the retail department[4] and presented a written request for consideration. (Williams Dep. 19:4-23:12, 97:2-8, 107:2-21, ex. 2; Stephen Smith Aff. ¶ 3.)[5] At that time, Martin and General Manager Stephen Smith informed Plaintiff that there were no Shift Manager positions available in the retail/301 department. (Williams Dep. 21:18-24, 97:2-8; Stephen Smith Aff. ¶ 3.)

In a meeting that occurred on or about October 26, 2009, Plaintiff met with Martin and Shift Manager Karen Adams. (Martin Aff. ¶11). During the meeting, Plaintiff expressed her dissatisfaction with Martin's decision to reassign the Citizens Bank Student Loan account and stated her belief that the move was unfair. (*Id.*) According to Defendant, Plaintiff said she was not happy and did not want the Honda/Nissan account. (*Id.*) Martin asked Plaintiff which client assignment would make her happy. (*Id.*) Plaintiff responded "Fifth Third" and Martin told her she could have that client. (*Id.*) Defendant claims that Plaintiff then reversed herself and requested to have her original client back. (*Id.*) When Martin denied this request, Plaintiff became louder and more hostile. (*Id.*) Plaintiff told Martin all she saw was "black and white" and suggested that Martin should quit her job. (*Id.*) At that point Martin called for Stephen Smith to come to her office. (*Id.*) Plaintiff disputes Defendant's account of this meeting; however, Plaintiff has not cited any record evidence in support of her own version of events.[6]

---

[4] It appears to the Court that "301" and "retail" referred to the same department and not to two separate departments.

[5] Plaintiff adds that she had also expressed interest in a move to Shift Manager prior to this time. However, Plaintiff has not cited any evidence in the record to support this assertion. Therefore, the Court need not address it.

[6] Plaintiff's deposition testimony about the meeting is largely consistent with Martin's version. Williams Dep. 100:18-103:18, 105:8-108:5. Plaintiff states in her brief that she actually expressed her unhappiness with losing the Fifth Third account, and not the Citizens Bank account. Pl.'s Resp. to Statement of Fact ¶ 16. Plaintiff contrasts the profitability of the Fifth

According to Defendant, Stephen Smith immediately came to Martin's office, and Plaintiff continued to speak in a loud and hostile manner to Smith, interrupting him when he tried to speak. (Martin Aff. ¶ 12; Smith Aff. ¶ 3.) Plaintiff denies that she spoke in this manner to Smith. (Williams Aff. ¶ 6.) Rather than risking a further escalation of the situation, Smith left the meeting to go to his office. (Smith Aff. ¶ 3.) The parties disagree about who left the meeting first: Defendant states that Plaintiff followed Smith continuing to speak in a loud and hostile tone, a characterization Plaintiff denies; Plaintiff states that Smith followed Plaintiff to her desk. (*Id.*; Williams Aff. ¶ 6.) Plaintiff asserts that she mumbled "this is pitiful" to which Smith turned and said, "If we are so pitiful . . ." but without completing his sentence. (Williams Aff. ¶ 6.) Defendant avers that Smith actually said "If you are so unhappy . . ." (Stephen Smith Aff. ¶ 3). Plaintiff interrupted Smith and said, "If I am so unhappy what? Are you going to fire me?" to which Smith replied, "No, I am not going to fire you." (*Id.*) Smith did tell Plaintiff that the conversation was not going to continue on the collection floor and invited Plaintiff to his office. (*Id.*)

As the conversation continued in Stephen Smith's office, Plaintiff demanded a Shift Manager position in the retail department. (Williams Dep. 107:2-24; Smith Aff. ¶ 3.) Smith explained there were no Shift Manager positions available in that department but did offer Plaintiff the position as Shift Manager in the student loan department. (*Id.*) Plaintiff declined the job in student loans and stated her preference for the retail department. (*Id.*) Plaintiff also mentioned the Shift Manager position that Harper had resigned in 2008, a position Smith explained he eliminated due to the

---

Third account with the lower rate of profitability of the Honda/Nissan account. Plaintiff has not actually cited any evidence to support these assertions. Even so, the Court is not convinced that the factual differences in these versions of the October 26 meeting are genuinely material.

downturn in business. (*Id.*)[7]

Bob Wyatt heard about the disruption caused by Plaintiff and went to Smith's office. (Wyatt Aff. ¶ 6; Stephen Smith Aff. ¶ 3.) Plaintiff asked Wyatt why he was there. (*Id.*) According to Plaintiff, she had made a number of complaints over time to Wyatt, who worked in human resources, and none of her complaints were ever addressed. (Williams Dep. 108:6-13; Williams Aff. ¶ 7.)

On October 28, 2009, shortly after reporting to work, Plaintiff confronted Martin in her office about the status of changing the client assignments. (Martin Aff. ¶¶ 14 & 15.) Martin told Plaintiff that she was giving her the Fifth Third Bank account, per Plaintiff's request from the previous meeting. (*Id.*) Plaintiff angrily stated, "You'll probably have Jessica sabotage my settlements." (*Id.*)[8] Due to Plaintiff's conduct from the previous meeting, Martin directed Plaintiff to accompany her to Wyatt's office. (*Id.*) According to Defendant, Plaintiff made more complaints against Martin, stating, "All Patti sees is black and white, when you start seeing green maybe we'll start to collect some money around here." (Wyatt Aff. ¶ 7; Martin Aff. ¶ 15.) Plaintiff complained that Patti was the problem and that she needed to go because none of the employees wanted to work for her. (*Id.*) In an effort to defuse the situation, Martin left the meeting and informed J.S. "Steve" Smith, Defendant's president ("Steve Smith"), about what was occurring with Plaintiff. (Wyatt Aff. ¶ 16; Steve Smith Aff. ¶ 5). Steve Smith came to Wyatt's office and attempted to calm Plaintiff down, advising her to take her concerns to human resources. (*Id.*) Plaintiff responded that Wyatt does

---

[7] Plaintiff denies that she discussed Harper's former job during this conversation with Smith and cites for support her summary judgment affidavit. The affidavit though does not indicate whether Harper's old position was or was not discussed. *See* Williams Aff. ¶ 6. Therefore, Plaintiff has failed to support her factual contention on this point.

[8] The parties do not further identify Jessica or explain what Plaintiff meant by this statement.

nothing in response to her complaints and told Steve Smith that he did not run the company. (*Id.*) Plaintiff also adds that she attempted to tell Steve Smith about instances of sexual misconduct in the workplace, including an employee entering into a relationship with a manager to save her job. (Williams Aff. ¶ 8.)[9]

After hearing some of Plaintiff's comments, Steve Smith said he had enough and began to leave. (Wyatt Aff. ¶ 7; Steve Smith Aff. ¶¶ 6 & 7.) According to Defendant, Plaintiff put her hand on Smith's arm and stated sharply, "No, you are not!" (*Id.*) After a moment, Plaintiff let go, and Steve Smith left. (*Id.*) Plaintiff denies that she ever touched Smith but claims that she put her hand on the door. (Williams Aff. ¶ 9.) Even after Steve Smith left, Plaintiff followed him to his office shouting, "I want Patti gone." (Steve Smith Aff. ¶ 6.)[10] Steve Smith considered Plaintiff's conduct to be abusive and out of control and reported the incident to his son, Stephen Smith. (Steve Smith Aff. ¶ 7.) Plaintiff adds that Steve Smith was not aware of the issues related to her reassigned accounts and that Smith opined to her that it seemed she and Martin were having a personality conflict. (Williams Aff. ¶ 9.)

Following these events and over the next few days, Stephen Smith and Wyatt discussed Plaintiff's behavior and the hostile remarks she made. (Wyatt Aff. ¶ 8; Stephen Smith Aff. ¶ 4.) Both concluded that Plaintiff's conduct was extremely unprofessional, abusive, and irrational. (*Id.*)

---

[9] Plaintiff's affidavit further states, "The sexual harassment, sexual advances, and racial slurs were also the kinds of corruption that were prevalent that I wanted to bring to Mr. Smith's attention. These things contributed to the hostile work environment." Williams Aff. ¶ 8. It is not clear whether Plaintiff actually raised these issues with J.S. Smith during this meeting.

[10] Defendant adds that Plaintiff eventually returned to her work area, though the record cited by Defendant does actually show this. In any event, this assertion does not appear to be material to the issues presented.

Both further decided that the reassignment of Plaintiff's accounts did not justify or excuse her hostile reaction. (*Id.*) Defendant asserts that reassignment of clients among employees was not uncommon. (*Id.*) Management used it as a tool with collectors to break habits, routines, and patterns and to reinvigorate activities and add new perspectives. (*Id.*) Stephen Smith and Wyatt determined that Plaintiff's claims that the reassignments were somehow personal were unfounded. (*Id.*) Both were also concerned that Plaintiff's reaction seemed to be irrational and led them to speculate that Plaintiff might be experiencing other, nonwork-related stress. (*Id.*) The decision was made, nevertheless, not to terminate Plaintiff's employment. (*Id.*) Stephen Smith and Wyatt did decide to move Plaintiff to another department and make her Shift Manager for the Capital One account where a Shift Manager position was open. (*Id.*) Plaintiff would no longer report to Martin but to Gretchin Pumphrey, the Collection Manager in that department. (*Id.*) Plaintiff maintains that she was moved because of Martin's personal dislike for her and as part of the hostile and discriminatory work environment, though without citing any evidence for these contentions.

On November 4, 2009, Plaintiff met with Stephen Smith, Wyatt, and Gretchin Pumphrey in Wyatt's office. (Wyatt Aff. ¶ 9; Stephen Smith Aff. ¶ 6.) In that meeting, Wyatt attempted to read a prepared statement that referred to Plaintiff's recent hostile and disrespectful conduct. (*Id.*) Almost immediately, Plaintiff interrupted Wyatt. (*Id.*) Each time Wyatt would resume reading the statement, Plaintiff continued to interrupt in a rude manner. (*Id.*) After many attempts and many interruptions, Wyatt gave up reading the statement and told Plaintiff that if she would just listen she would learn that she was being promoted to a Shift Manager position in Capital One. (*Id.*) The new position would mean a $300 per month increase in salary as well as the opportunity to earn commission on net collections. (*Id.*) According to Defendant, its Shift Managers earn between

$75,000 and $80,000 per year, and Plaintiff could have expected to have earnings in that range. (*Id.*) Plaintiff was then earning about $55,000 per year. (*Id.*) Plaintiff admits that she interrupted Wyatt as he read the statement but claims that she did so to ask questions and not to be disrespectful. (Williams Aff. ¶ 16.) Plaintiff also states that she regarded the Shift Manager position in the Capital One department as a possible demotion based on the fact that the department's collections were low and her salary would be based on collections. (*Id.*)

In response to Defendant's offer, Plaintiff stated that she wanted $1,000.00 per month raise. (Wyatt Aff. ¶ 10; Smith Aff. ¶ 7) Stephen Smith informed Plaintiff that such a demand was impossible. (*Id.*) Plaintiff then stated that she did not want the new position and would stay in her current position until another opening became available. (*Id.*) Wyatt advised Plaintiff that staying in her current position was not an option, given her conduct and remarks about Martin. (*Id.*) Plaintiff was told that she should go home to consider the offer and that the Company would be in touch with her at the end of the week. (*Id.*) Plaintiff was also told she would be administratively suspended until that time. (*Id.*) When Plaintiff left the meeting, Stephen Smith and Wyatt assumed Plaintiff had left the premises. (*Id.*) Plaintiff adds that she was not given a written suspension and requested that she receive something in writing. (Williams Aff. ¶ 11.)

Within a few minutes of the end of the meeting, Wyatt received notification that Plaintiff had not left the building but had returned to her work area. (Wyatt Aff. ¶¶ 11 & 12; Smith Aff. ¶ 8.) Wyatt and Stephen Smith immediately went to Plaintiff's work area and told her they would like to speak with her privately. (*Id.*) When Plaintiff asked why, Wyatt responded that he had instructed her to go home and that he would call her later in the week. (*Id.*) Plaintiff responded that she was not going anywhere. (*Id.*) Wyatt repeatedly instructed Plaintiff to leave the office, and Plaintiff

refused to do so. (*Id.*) Wyatt finally told Plaintiff that she needed to be very careful about what she was saying and doing and that if she did not leave as requested, she would be considered insubordinate. (*Id.*) At that point, Defendant would have no choice but to terminate her employment. (*Id.*) Plaintiff refused to leave and told Wyatt that he should just go ahead and call the police. (*Id.*) Wyatt then told Plaintiff that her employment was terminated. (*Id.*)

After being told she was terminated, Plaintiff went on a tirade of profanities, threats, and insults directed at the Company, Patti Martin, and her co-workers. (Williams Dep., ex. 12; Audio Tape Tr. Recorded Nov. 4, 2009; Wyatt Aff. ¶¶ 12-14; Smith Aff. ¶ 9.) Plaintiff yelled at Martin that she would "get" her and her daughter. (*Id.*)[11] Over the next ten minutes, Plaintiff continued the tirade and walked down the aisles knocking plaques off the walls and objects off of desks. (*Id.*) Other employees tried to calm Plaintiff but without success. (*Id.*) At one point, Plaintiff attempted to incite coworkers to cease work, and when none of them did, Plaintiff began directing insults and profanities at them. (*Id.*) The police arrived just shortly after Plaintiff had left the building. (*Id.*)

Plaintiff alleges that Defendant's employees made a series of racial remarks in the workplace. Plaintiff claims that in 2006 or 2007, an employee named Michael Love used a racial epithet. (Williams Dep. 132:17-19, 135:14-136:3). Love was attempting to say the word "Nissan" and apparently by some accident used the slur. (*Id.*) According to Plaintiff, this incident occurred where a number of female African-American employees were present, and one of those employees Saskia Harris complained about it and was later terminated. (Williams Aff. ¶ 13.) Plaintiff was also aware that in 2005 Michael Love had made a remark about white people going to a better pool and that Love was required to make an apology to his co-workers for the comment. (Williams Dep. 133:22-

---

[11] Plaintiff denies that she ever threatened Martin or her daughter. Williams Aff. ¶ 12.

134:12.)  In 2004, Plaintiff claims that another employee named Cindy Singleton repeated a comment made by her husband about "some black woman in a polka dot dress." (Pl.'s Dep. 132:19-21, 133:5-7.)  Plaintiff states that the comment was meant to compare the woman in the dress to Aunt Jemima.  (Williams Aff. ¶ 13.)  Plaintiff adds that after the 2004 incident, she and another employee contacted the NAACP, which forwarded the complaint to Wyatt.  (*Id.*)

Plaintiff also claims that several incidents occurred in the workplace that form the basis for her sexual harassment claims.  In 2001, a Unit Manager named Scott Caulk told Plaintiff to "lick his b---s" after Plaintiff told Caulk that he wanted to look into another female employee's eyes (Williams Dep. 137:22-23, 151:11-24; ex. 17; Wyatt Aff. ¶ 15.)  Defendant adds that Caulk has not worked for Defendant since 2002.  (Wyatt Aff. ¶ 15.)  Plaintiff made complaints about Caulk to several managers but claims that no action was taken.  (Williams Aff. ¶ 14.)  Plaintiff also makes various accusations of sexual *quid pro quo* in the workplace.  According to Plaintiff, Martin dated an employee's brother-in-law, allowing the employee to keep her job.  (Williams Dep. 138:23-139:2.)  Plaintiff further claims that an employee named Andre Williams dated several different women from the office.  (Williams Dep. 137:19-21.)  Plaintiff also restated various rumors from the office.  For example, Plaintiff once heard that Stephen Smith had sexual encounters with two women from the office and that he met his current wife in the workplace.  (Williams Dep. 138:7-15.)  Based on another office rumor, Plaintiff testified that an employee named Bruce Long dated a female co-worker named Amber, who allegedly told others that she felt like she could keep her job longer if she slept with him. (Williams Dep. 137:15-19.)  Plaintiff also testified that a female employee in Plaintiff's group allegedly performed a sex act on a co-worker on the premises of the business. (Williams Dep. 138:16-23.)  Plaintiff claims that this was no rumor and that when she reported the

incident to Martin, no action was taken. (Williams Aff. ¶ 40.)

Plaintiff has testified that her claim of hostile work environment is based on the episodes of a racial and sexual nature in the workplace as well as other incidents. For example, Plaintiff stated that a female employee in the student loan department once fought another employee. In another episode, an employee poured water on a Shift Manager after being told that she was terminated. Finally, Plaintiff states that she once heard that a man brought a gun to work on the collection floor. (Williams Dep. 163:20-164:16).

Based on this evidence, Plaintiff has alleged that Defendant is liable for race discrimination in violation of Title VII & § 1981 for the failure to promote Plaintiff as requested on October 14, 2009; retaliation for discharging Plaintiff on November 4, 2009, after she had engaged in protected activity in October 2009; and hostile work environment. In its Motion for Summary Judgment, Defendant argues that it is entitled to judgment as a matter of law on all claims. First, Defendant contends that Plaintiff cannot prove her failure-to-promote claim because the position she requested in October 2009 was not available. In response to Plaintiff's request for a promotion, Defendant did offer her a position as Shift Manager in the Capital One department, which Plaintiff declined. Second, Defendant argues that it had a legitimate, non-discriminatory reason for terminating Plaintiff.[12] Plaintiff refused to leave the premises after management specifically directed her to go home on November 4, 2009, and warned her that failure to comply would result in her termination. Defendant asserts that Plaintiff cannot show that the proffered reasons for her termination were

_____

[12] Defendant also contends that Plaintiff cannot prove her retaliation claim because she has adduced no evidence of a similarly situated, non-protected employee receiving more favorable treatment. However, as more fully discussed below, this is an essential element of a disparate treatment claim, and not an element of a claim of retaliation.

pretextual. Finally, Defendant argues that Plaintiff's hostile work environment claim is based on the stray remarks of co-workers or rumors and hearsay. In essence, Defendant argues that Plaintiff cannot prove that the conduct was sufficiently severe and pervasive to create a hostile work environment. For all of these reasons, Defendant contends that Plaintiff's claims are subject to dismissal.

In response Plaintiff argues that several issues of material fact exist in this case, making summary judgment improper. With respect to her failure-to-promote claim, Plaintiff argues that a position as Shift Manager in the retail department had been available prior to October 2009. Defendant never posted an opening for the job after Shelley Harper resigned it in 2008. Instead Defendant simply renamed the position Turnover Specialist, which was then filled without ever inviting applications for the job. Plaintiff also testified that the Shift Manager position in the Capital One department, which Defendant did offer her, was not substantially similar in that the position would have paid her less. Plaintiff further maintains that issues of fact preclude judgment as a matter of law on her retaliation claim. While Defendant asserts that Plaintiff was terminated for insubordination, Plaintiff insists that she refused to leave the premises until she received a written notice of her suspension. Plaintiff also refers to other past incidents that she complained about including the use of racial slurs in the workplace and an offensive statement made to her by a white manager. As for her burden to show that Defendant's reasons for her dismissal were pretext, Plaintiff argues that Defendant failed to provide her written notice of her suspension, while other employees received written disciplinary statements. Plaintiff also argues that Defendant treated similarly situated, white male employees differently. According to Plaintiff, the only possible distinguishing factor was Plaintiff's protected activity. Plaintiff asserts that Defendant was

undeniably aware of her complaints about inappropriate behavior in the workplace because she had raised them with management, requested that the NAACP intervene, and ultimately filed a charge with the EEOC. Therefore, the Court should deny Defendant's Motion for Summary Judgment.[13]

Defendant has filed a reply brief. Defendant argues that Plaintiff should not be allowed to rely on the affidavit of Ophelia Griffin, which was submitted with her response brief. Defendant contends that Plaintiff never disclosed Ms. Griffin in discovery as an individual with relevant knowledge in this case.[14] Defendant further responds that Plaintiff has failed to show how several material facts in this case are actually in dispute. For example, Plaintiff has only her own opinion to support her contention that the positions of Shift Manager and Turnover Specialist were substantially the same position. Defendant asserts that Plaintiff has not disputed other facts about the meetings and events leading up to her termination. Defendant argues that as a result Plaintiff has not met her burden to survive summary judgment.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that a party is entitled to summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[15] In reviewing a motion for summary judgment, the

---

[13] Plaintiff has not briefed her claim for hostile work environment. The Court considers Plaintiff's failure to respond to the Motion for Summary Judgment on this point more fully below.

[14] Defendant has also filed a separate Motion to Strike (D.E. # 36), which the Court addresses below.

[15] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Canderm Pharmacal, Ltd. v. Elder Pharms, Inc.*, 862 F.2d 597, 601 (6th Cir. 1988).

evidence must be viewed in the light most favorable to the nonmoving party.[16]  As a result, the "judge may not make credibility determinations or weigh the evidence."[17]  When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial."[18]  It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts."[19]  These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict.[20]  When determining if summary judgment is appropriate, the Court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."[21]

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[22]  In this Circuit, "this requires the nonmoving party to 'put up or shut up' [on] the critical issues of [her] asserted causes of action."[23]

---

[16] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[17] *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994).

[18] *Celotex*, 477 U.S. at 324.

[19] *Matsushita*, 475 U.S. at 586.

[20] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

[21] *Id*. at 251-52.

[22] *Celotex*, 477 U.S. at 322.

[23] *Lord v. Saratoga Capital, Inc.*, 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989)).

<u>**ANALYSIS**</u>

For the reasons that follow, the Court holds that Defendant is entitled to judgment as a matter of law on each of Plaintiff's claims of unlawful discrimination. Plaintiff has alleged her claims under Title VII as well as pursuant to 42 U.S.C. § 1981. Title VII states that it is an "unlawful employment practice for an employer . . . to discriminate against any individual . . . because of [her] race, color, religion, sex, or national origin."[24] Title 42 U.S.C. § 1981 prohibits intentional race discrimination in "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."[25] The same legal standards govern Plaintiff's claims under both statutes.[26] Therefore, the Court will consider each of Plaintiff's separate theories in turn.

**I. Motion to Strike**

As a procedural matter, Defendant has filed a Motion to Strike directed to an affidavit submitted with Plaintiff's response brief. Plaintiff has produced an affidavit from Ophelia Griffin, who like Plaintiff was an employee of Defendant for twelve years.[27] Ms. Griffin's affidavit offers

---

[24] 42 U.S.C. § 2000e–2(a)(1). In its Motion for Summary Judgment, Defendant argues that Plaintiff cannot prove that she suffered discrimination on account of her color, though she has alleged such a claim in her pleadings. Plaintiff has failed to respond to this argument and otherwise failed to meet her burden to support such a theory for purposes of summary judgment. Therefore, Defendant's Motion is **GRANTED** on this issue.

[25] 42 U.S.C. § 1981(b). While it is undisputed that Plaintiff was an at-will employee of Defendant, the Sixth Circuit has held that § 1981 protects an at-will employee in the state of Tennessee. *Aldridge v. City of Memphis*, 404 F. App'x 29, 37 n.9 (6th Cir. 2010) (citations omitted).

[26] *Jones v. W. Reserve Transit Auth.*, 455 F. App'x 640, 646 (6th Cir. 2012); *Madden v. Chattanooga City Wide Serv. Dep't,* 549 F.3d 666, 673 (6th Cir. 2008).

[27] *See* Griffin Aff. (D.E. # 33-2).

18

additional factual support for Plaintiff's claims about a lack of female African-American Shift Managers in the company as well as Defendant's alleged practice of not posting job openings in an effort to ensure that female African-American employees would not apply.[28]  According to Defendant, Plaintiff never disclosed Ms. Griffin in discovery as a person with relevant knowledge. For this reason, Defendant moves to strike Ms. Griffin's affidavit from the record.

As a general rule, a motion to strike is not the proper means for raising an objection to evidence offered in support of a claim.[29]  Federal Rule of Civil Procedure 12(f) addresses motions to strike and authorizes the court to "order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."[30]  Affidavits and other such exhibits submitted by the parties at summary judgment are not among the documents identified as "pleadings" by the Federal Rules.[31]  By contrast, Local Rule of Court 56.1(e) permits a party to raise any objections to evidence submitted at summary judgment and outlines the proper procedure for bringing the objection to the Court's attention.[32]  Under the circumstances, the Court finds that the better practice is to treat the Motion to Strike as an evidentiary objection.

As for the merits of Defendant's objection, the Court finds that it need not resolve the issue

---

[28] *Id.* ¶ 2.

[29] 5A Wright and Miller, *Federal Practice and Procedure:* Civil 2d § 1380 (West 1990).

[30] Fed. R. Civ. P. 12(f).

[31] Fed. R. Civ. P. 7(a) (listing the only documents allowed under the rules as "pleadings").

[32] L.R. 56.1(e) ("Objections to evidentiary materials offered in support of or in opposition to motions for summary judgment shall be included within a timely response or reply memorandum, shall be separately designated as a specific evidentiary objection, and shall identify the Rule of Evidence or other authority that establishes inadmissibility of the proffered evidence.").

here. Aside from attaching the affidavit to her response brief, Plaintiff has failed to cite to the Griffin Affidavit to support any of her claims. Pursuant to Rule 56(c)(1), any "party asserting that a fact . . . is genuinely disputed must support the assertion by citing to particular parts of materials in the record, including . . . affidavits . . . ."[33] The Court need not consider materials Plaintiff fails to cite.[34] Even if the Court considered Ms. Griffin's affidavit for purposes of its summary judgment analysis, the Court concludes that Defendant would still be entitled to judgment as a matter of law. Therefore, the Motion to Strike is **DENIED** as moot.

## II. Failure to Promote Claim

"[A] plaintiff must either present direct evidence of discrimination or introduce circumstantial evidence that would allow an inference of discriminatory treatment."[35] In the case at bar, the parties agree that Plaintiff has not adduced any direct evidence of discrimination and as such must create an inference of unlawful discrimination by means of circumstantial evidence. In order to make out a prima facie case of discrimination based on a failure to promote, Plaintiff must prove that (1) she is a member of a protected class; (2) she applied for and was qualified for a promotion; (3) she was considered for and was denied the promotion; and (4) an individual of similar qualifications who was not a member of the protected class received the job at the time Plaintiff's request for the promotion was denied.[36] The Court holds that Plaintiff has failed to establish all of

---

[33] Fed. R. Civ. P. 56(c)(1)(A).

[34] Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

[35] *Johnson v. Kroger Co.,* 319 F.3d 858, 864–65 (6th Cir. 2003).

[36] *Nguyen v. City of Cleveland,* 229 F.3d 559, 562-63 (6th Cir. 2000).

these elements. Specifically, Plaintiff has not come forward with proof that the position she sought was actually available at the time she requested it.

The record evidence shows that shortly after Plaintiff met with Patti Martin in October 2009, Plaintiff sought a promotion to become Shift Manager in the retail department. Plaintiff requested a position that was vacated in 2008 after the employee who previously held the job had resigned. In response to her request, Plaintiff was offered an open Shift Manager position in the Capital One department but turned it down. The parties disagree about whether the Shift Manager position Plaintiff preferred was open in October 2009 and whether Defendant had simply given the job a new title. Defendant claims that it eliminated the position for business reasons. Plaintiff counters that Defendant only changed the job title to Turnover Specialist and that the Turnover Specialist performed essentially the same duties as the Shift Manager in the retail department.

Even viewing this evidence in the light most favorable to Plaintiff, the fact remains that Plaintiff sought the Shift Manager job in the retail department, and never expressed any interest in the Turnover Specialist position. More importantly, there is no evidence before the Court showing that a Shift Manager position in the retail department (or a Turnover Specialist position for that matter) was available in October 2009. Essential to Plaintiff's failure to promote claim is some showing that the position she sought was actually available at the time she sought it.[37] In the absence

---

[37] *Patterson v. McLean Credit Union*, 491 U.S. 164, 186-87 (1989) (superseded on other grounds by statute) ("Here, petitioner need only prove by a preponderance of the evidence that she applied for and was qualified *for an available position*, that she was rejected, and that after she was rejected respondent either continued to seek applicants for the position, or, as is alleged here, filled the position with a white employee) (emphasis added); *Freeman v. Potter*, 200 F. App'x 439, 448 (6th Cir. 2006) (setting forth elements of failure to promote claims and specifying that a plaintiff must show "she was qualified for an available position"); *Pritchard v. Office Max, Inc.*, 202 F.3d 269, at *4 (6th Cir. 2000) (unpublished table decision) ("Pritchard's failure to apply for the position when it was available is fatal to her prima facie case."); *Nguyen*,

of any proof that Defendant had an opening for the position Plaintiff requested, Plaintiff cannot establish her failure-to-promote claim. Therefore, the Court concludes that Defendant is entitled to judgment as a matter of law on this issue.

As an additional matter, Plaintiff has asserted in her summary judgment brief that on other occasions Defendant filled open positions without posting the jobs, including the newly created Turnover Specialist job. Plaintiff argues that "[t]he Shift Manager position was available at a minimum two times during Plaintiff's employment with Defendant" and that the Turnover Specialist positions "were not posted, but simply given to two males."[38] As previously discussed, there is no proof that Plaintiff ever sought the Turnover Specialist position. The Sixth Circuit has held that "in failure to promote cases a plaintiff does not have to establish that he applied for and was considered for the promotion when the employer does not notify its employees of the available promotion or

_____

229 F.3d at 564-65 (affirming dismissal of failure to promote claim where employee sought the position of "Chief of Enforcement" when no such position was available); *Coleman v. Sun Fin. Group & Sun Life Assur. Co. of Canada*, 85 F.3d 628 (6th Cir. 1996) (holding that plaintiff in a failure to promote case must prove, among other things, that "he or she applied for an available position"); *Anderson v. Premier Indus. Corp.*, 62 F.3d 1417 (6th Cir. 1995) (same); *Bohanan v. United Parcel Serv.*, 918 F.2d 178 (6th Cir. 1990) (same); Conner-*Clement v. Trinity Indus., Inc.*, CIV. A. 307-CV-1154, 2009 WL 211141 (M.D. Tenn. Jan. 28, 2009) ("[Plaintiff] has not established that there was actually an open position in that department."); *Syvongxay v. Henderson,* 147 F. Supp. 2d 854, 858 (N.D. Ohio 2001) (holding that plaintiff failed to establish a prima facie case where there was no evidence of an open position); *Storch v. Beacon Hotel Corp.*, 788 F. Supp. 960, 965 (E.D. Mich. 1992) (applying Mich. law) ("An employment discrimination claim for failure to promote simply cannot stand absent proof that a position was available and that the employee applied for it."). *See also Thompson v. UHHS Richmond Heights Hosp., Inc.*, 372 F. App'x 620, 623-24 (6th Cir. 2010) (setting forth elements of a failure to transfer claim to include "at the time of her termination [plaintiff] was qualified for other available positions within the corporation").

[38] Pl.'s Resp. in Opp'n 11 (D.E. # 33).

does not provide a formal mechanism for expressing interest in the promotion."[39] The Sixth Circuit recognized this exception "because in many cases where discriminatory animus truly is at issue, an employer may simply avoid advertising a particular opening so as to avoid controversy among affected employees."[40] In order to make out a prima facie case where the employer never posts the opening, the plaintiff need only show that she "was passed over despite being qualified for the job."[41]

Even under this more lenient standard, Plaintiff has still failed to make out her failure-to-promote claim. Plaintiff has not actually stated a claim for being passed over for the two previous openings for Shift Manager positions (or for the Turnover Specialist positions). Although Plaintiff's operative pleadings were prepared without the assistance of counsel, the *pro se* Complaint only alleges that she made a written request for the Shift Manager position in retail, which was denied on October 19, 2012, and as previously discussed, such a post was not available at that time.[42] "[A] plaintiff may not expand his claims to assert new theories for the first time in response to a summary judgment motion."[43] Plaintiff has not pleaded any cause of action based on the failure to promote her at other times and for other positions and has not sought leave to amend her complaint to add

---

[39] *Russell v. Ohio, Dept. of Admin. Servs.*, 302 F. App'x 386, 392 (6th Cir. 2008) ("However, the facts which [the plaintiff] alleges do raise the possibility that her employer intentionally avoided posting jobs for which Russell would have been qualified."); *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1022 (6th Cir. 2000).

[40] *Dews*, 231 F.3d at 1022.

[41] *Id.*

[42] *Pro Se* Compl. ¶ 10 (D.E. # 1).

[43] *Desparois v. Perrysburg Exempted Vill. Sch. Dist.*, 455 F. App'x 659, 666 (6th Cir. 2012) (citing *Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007) (other citation omitted)).

such allegations.[44]  The Court finds that Plaintiff's attempt to expand the scope of her claims at

summary judgment is not well-taken.

Putting aside this deficiency in Plaintiff's *pro se* pleadings, it is true that Plaintiff's EEOC

charge stated, "I have been denied promotional opportunities in that I was not considered for the

Shift Manager position" and "I have expressed my interest in the Shift Manager position to upper

management."[45]  However, the charge states that the dates this discrimination took place occurred

at the earliest on July 15, 2009, and at the latest on October 9, 2009.  Plaintiff has adduced no

evidence that a position for Shift Manager in the retail department was available during that time

frame or that she was passed over when Defendant filled it.  And even if the Court construed the

charge liberally to include times other than those listed, Plaintiff still has not shown when exactly

she was passed over for promotion[46] or that she put Defendant on "continuous notice that she wanted

---

[44] *Tucker v. Union of Needletrades, Indus., & Textile Emps.*, 407 F.3d 784, 787-88 ("A non-moving party plaintiff may not raise a new legal claim for the first time in response to the opposing party's summary judgment motion. At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Rule 15(a).").

[45] Williams Dep., ex. 3, Charge of Discrimination, Oct. 23, 2009 (D.E. # 17-7). Plaintiff's amended charge is also part of the record as exhibit 7 to her deposition.  The Court would emphasize that the charge made no reference at all to the Turnover Specialist position.

[46] Plaintiff bears the burden to exhaust her administrative remedies by timely filing a charge of discrimination within 300 days if the plaintiff initiates proceedings with a state or local agency such as the Tennessee Human Rights Commission ("THRC").  42 U.S.C. § 2000e–5(e)(1).  The procedural requirements are strictly enforced. *Graham–Humphreys v. Memphis Brooks Museum of Art, Inc.,* 209 F.3d 552, 557 (6th Cir. 2000).  Assuming Plaintiff filed her charge with the THRC, she had a 300-day filing period, meaning only acts occurring within 300 days of October 23, 2009, that is, on or after December 27, 2008, would have been timely.  Plaintiff has adduced no evidence of being passed over for a promotion to Shift Manager in that period of time.  On the contrary, Plaintiff testified only that she was passed over when Harper was given the Shift Manager job.  The record shows that Harper left the job in August 2008, making any claim based on Harper first receiving the job untimely.

the [Shift Manager] position" thereby creating an obligation for Defendant "to consider her when the position[s] reopened."[47] Plaintiff only testified that some time after Harper resigned her position as Shift Manager in retail in August 2008 did she inform Patti Martin that she would be interested in moving up to that job. Plaintiff has not shown that she ever expressed interest in a position as Shift Manager at any time prior to August 2008. For these reasons, the Court finds Plaintiff's argument about being passed over at other times unavailing.

Having concluded that Plaintiff cannot make out a prima facie case for failure to promote, Defendant's Motion is **GRANTED** on this claim.

## III. Retaliation

Defendant next seeks summary judgment on Plaintiff's claim for retaliation. In order to make out her prima facie case of retaliation, Plaintiff must demonstrate the following: (1) that she engaged in protected conduct; (2) that Defendant had knowledge of her protected activity; (3) that Defendant took an adverse employment action against her; and (4) that there was a causal connection between the protected activity and the adverse employment action.[48] For the reasons that follow, the Court holds that Defendant is entitled to summary judgment on Plaintiff's retaliation claim.

As an initial matter, the Court finds that Defendant has not sought summary judgment on any of the elements of Plaintiff's prima facie case. In fact, neither party has briefed all of the elements of the claim. Defendant seeks summary judgment on the pretext issue, arguing that Plaintiff has failed to adduce any evidence to challenge its legitimate reasons for terminating her for

---

[47] *Pritchard*, 202 F.3d 269, at *4. *See also Dews*, 231 F.3d at 1022 ("[T]he company is held to a duty to consider all those who might reasonably be interested in a promotion were its availability made generally known.").

[48] *Arendale v. City of Memphis*, 519 F.3d 587, 606 (6th Cir. 2008).

insubordination on November 4, 2009. For her part Plaintiff largely discusses the second element of the claim, Defendant's knowledge of Plaintiff's protected activity, though it does not appear to the Court that Defendant even disputes this fact.[49] What is more, neither party has briefed all of the evidence necessary to make each of the required showings for Plaintiff's retaliation claim. For example, the parties have not argued the evidence that would go to demonstrate a causal connection between Plaintiff's protected activity and her termination. In short, the Court lacks a complete record to consider fully whether Plaintiff has evidence to support each element of her retaliation claim. In the absence of any argument to the contrary, however, the Court will assume for purposes of summary judgment that Plaintiff can carry her burden to make out a prima facie case.

Once a plaintiff has established a prima facie case of retaliation, thereby creating a presumption that the defendant has unlawfully discriminated against the plaintiff, the burden of production, but not the burden of persuasion, shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions.[50] Only if the defendant meets this obligation does the burden shift back to the plaintiff to "then prove that the proffered reason was actually a pretext to hide unlawful discrimination."[51] The Court finds that Defendant has met its burden of production.

According to Defendant, Plaintiff's employment was terminated for insubordination.

---

[49] Plaintiff argues in her brief that "it is highly improbable that neither [decisionmaker] . . . would have disregarded Williams' protected activity" and goes on to discuss a series of cases related to this issue. Pl.'s Resp. in Opp'n 14-16. Plaintiff also briefly mentions the causation element. *Id.* at 13 ("Plaintiff, days before her termination, told Defendant employee Patti Martin to stop seeing things in black and white . . ., and less than one month before her termination filed a formal complaint with the EEOC.").

[50] *Carter v. Univ. of Toledo*, 349 F.3d 269, 273 (6th Cir. 2003).

[51] *Id.*

Defendant has adduced evidence that on November 4, 2009, Plaintiff was summoned to a meeting where the human resources representative read a prepared statement to Plaintiff, describing her recent conflicts with Martin and offering her a new position with the company.[52]  When Plaintiff declined to accept the new position and stated her preference to remain in her current job, management told her that was not an option.  Plaintiff was then informed that if she refused the new position, management was placing her on administrative suspension through the end of the week. Viewing the evidence in the light most favorable to Plaintiff, she left the meeting, returned to her desk, and requested from her direct supervisor a written statement about the suspension.  Upon learning that Plaintiff had not left the building, management confronted Plaintiff, and she refused to leave until she received something in writing.  Management advised her that unless she left, the company would consider her insubordinate and terminate her employment.  Plaintiff again refused and was dismissed. "Insubordination may constitute a legitimate ground for dismissal."[53]  Therefore, the Court holds that Defendant has met its burden of production at this step, and the burden now shifts to Plaintiff to prove that Defendant's proffered reason was mere pretext.

After Defendant has proffered a legitimate reason for its decision to dismiss Plaintiff, Plaintiff bears the burden to prove that Defendant's rationale for terminating her was pretext for discrimination.  Plaintiff may show that (1) Defendant's stated reasons had no basis in fact, (2) the stated reasons were not the actual reasons, or (3) the stated reasons were insufficient to explain

---

[52] Notably, it appears that Plaintiff's conduct occurring prior to November 4, 2009, was not the basis for her termination.

[53] *Algie v. N. Ky. Univ.*, 456 F. App'x 514, 517 (6th Cir. 2012) (citing *Russell v. Univ. of Toledo,* 537 F.3d 596, 609 (6th Cir. 2008)).

Defendant's actions.[54]  "A reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason."[55]  The Court finds that Plaintiff has cited no evidence to support any of these possible showings.

Plaintiff appears to make two separate arguments that go to the pretext issue.  First, Plaintiff seems to contend that Defendant's stated reason, her insubordination, had no basis in fact.  Plaintiff avers in her affidavit that Defendant always issued discipline in writing and that she refused to go home for concern that she would be considered absent without leave.  The fact remains (and Plaintiff admits this) that she was given a directive to leave the premises and she refused, even when management warned her that she would be terminated for insubordination.  For this reason alone, Plaintiff has not shown that she was not, in fact, terminated for insubordination.  Furthermore, Plaintiff has not offered any specific evidence concerning Defendant's disciplinary policies, such that a reasonable juror could reject Defendant's explanation and find that Defendant failed to follow its own procedures to provide written discipline in this instance.[56]  Thus, Plaintiff has not come forward with evidence from which  a reasonable juror could find that Defendant's stated reason had no basis in fact.

Second, Plaintiff also cites examples of non-protected employees who engaged in

---

[54] *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 (6th Cir. 2009).

[55] *Virts v. Consol. Freightways Corp. of Dela.*, 285 F.3d 508, 521 (6th Cir. 2002) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)); *Edmond v. State of Tenn. Dept. of Probation & Parole*,386 F. App'x 507, 515 (6th Cir. 2010).

[56] *Macy v. Hopkins Cty. School Bd. Of Educ.,* 484 F.3d 357 (6th Cir. 2007) (holding that evidence of the failure to follow internal procedures can be evidence of pretext but adding that "such a failure is, by itself, generally insufficient to support a finding of pretext") (internal quotation marks and brackets omitted); *Skalka v. Fernald Envtl. Restoration Mgmt. Corp.*, 178 F.3d 414, 421-22 (6th Cir. 1999).

inappropriate workplace behavior but never lost their jobs.  Proof of similarly situated employees engaging in the same conduct as Plaintiff but receiving more favorable treatment might show that Defendant's stated reasons were insufficient to explain Defendant's decision to dismiss Plaintiff.[57] "In order to show that an employer's proffered nondiscriminatory explanation is pretext on the grounds that a similarly situated employee received disparate treatment for the same conduct, the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in all of the *relevant* aspects."[58]  In the case at bar, Plaintiff would need evidence of other non-protected employees becoming openly insubordinate by, for example, refusing to comply with a directive from management even after receiving a warning about the consequences of the refusal. Plaintiff has not adduced such evidence here.  In her response brief, Plaintiff cites specific examples of other employees making racist comments or improper sexual remarks.  Even though these instances are vulgar and offensive, Plaintiff has not shown how this conduct amounts to or is substantially similar to her own act of insubordination leading up to her termination.  As such, Plaintiff has not shown that Defendant's stated reasons were insufficient to explain its decision to dismiss her.

Having concluded that Defendant had a legitimate, nondiscriminatory reason for terminating Plaintiff's employment and that Plaintiff has failed to show how Defendant's reasons were pretextual, Defendant's Motion is **GRANTED** on this claim.

---

[57] *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 378-79 (6th Cir. 2002).

[58] *Id.* (emphasis in original) (citation and internal quotation marks omitted).

### III.  Hostile Work Environment

Finally, Defendant seeks summary judgment on Plaintiff's claim for hostile work environment.  The Court finds that Plaintiff has failed to respond to Defendant's arguments on the hostile work environment claim or offer any legal argument to support her cause of action.  Plaintiff's briefing makes passing references to her allegations of hostile work environment but fails to show why summary should not be granted on this issue.[59]  District courts in this Circuit routinely grant summary judgment as to claims a plaintiff fails to support or address in a response to a motion for summary judgment.[60]  Arguably, Plaintiff has abandoned her unsupported claim for hostile work environment.  The Court holds that summary judgment would proper on this basis alone.  Therefore, Defendant's Motion is **GRANTED** on the hostile work environment issue.

Even if the Court reached the merits of the claim, the Court would conclude that summary judgment is warranted.  Title VII prohibits discrimination that is "so severe or pervasive as to alter

---

[59] The last page of Plaintiff's response in opposition states in a single sentence fragment: "Because a reasonable jury could infer that Defendant's refusal to post positions and promote African-American women to Shift Manager was discriminatory, and that Defendant's termination of Plaintiff was in retaliation for her complaints of discrimination and hostile work environment, where white and male employees engaged in gross misconduct without termination." Pl.'s Resp. in Opp'n 16.  This is the only reference to a hostile work environment theory Plaintiff included in the argument section of her brief.

[60] *Burress v. City of Franklin, Tenn.*, 809 F. Supp. 2d 795, 809 (M.D. Tenn. 2011); *Anglers of the Au Sable v. U.S. Forest Serv.,* 565 F. Supp. 2d 812, 839 (E.D. Mich. 2008)*; Dage v. Time Warner Cable*, 395 F. Supp. 2d 668, 679 (S.D. Ohio 2005); *Kattar v. Three Rivers Area Hosp. Auth.*, 52 F. Supp. 2d 789, 798 n.7 (W.D. Mich. 1999).  *See also Clark v. City of Dublin,* No. 05-3186, 2006 WL 1133577, at *3 (6th Cir. Apr. 27, 2006) (where the appellant did not properly respond to the arguments asserted against his ADEA and ADA claims by the appellees in their motion for summary judgment, the appellant had abandoned his ADEA and ADA claims); *Conner v. Hardee's Food Sys.,* No. 01-5679, 2003 WL 932432, at *4 (6th Cir. Mar. 6, 2003) (finding that, "Because Plaintiffs failed to brief the issue before the district court . . . Plaintiffs abandoned their . . . claim."); *Hazelwood v. Tenn. Dept. of Safety*, No. 3:05-cv-356, 2008 WL 3200720, at *8 (E.D. Tenn. Aug. 5, 2008).

the conditions of [the victim's] employment and create an abusive working environment."[61]  In order to establish a prima facie case of sexual harassment based on a hostile work environment, a plaintiff must demonstrate the following elements: (1) that she is a member of a protected class; (2) that she was subjected to harassment, either through words or actions, based on her protected status; (3) that the harassment had the effect of unreasonably interfering with the plaintiff's work performance and creating an objectively intimidating, hostile, or offensive work environment; and (5) there exists some basis for liability on the part of the employer.[62]  The Supreme Court has "made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment."[63] Conduct that is "merely offensive" is insufficient to support a hostile work environment claim.[64]

The Court must look at the totality of the circumstances to analyze whether the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.[65]  Appropriate factors to consider include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[66]

---

[61] *Hafford v. Seidner,* 183 F.3d 506, 512 (6th Cir. 1999) (quoting *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67 (1986)).

[62] *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 270 (6th Cir. 2009) (citation and quotation marks omitted)).

[63] *Faragher v. Boca Raton,* 524 U.S. 775, 788 (1998).

[64] *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993).

[65] *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 707 (6th Cir. 2007) (citation and quotation makes omitted).

[66] *Id.* (quoting *Harris,* 510 U.S. at 23).

"Isolated incidents. . . , unless extremely serious, will not amount to discriminatory changes in the terms or conditions of employment."[67] Therefore, only incidents that occurred because of a plaintiff's protected status are properly considered in the context of a claim of hostile work environment.[68]

The Court holds that Plaintiff has not adduced evidence to support her claim of hostile work environment. First of all, Plaintiff testified in her deposition that this claim was based in part on past incidents such as employees fighting in the workplace or an employee pouring water on a supervisor. Plaintiff has not shown that any of these incidents occurred as a result of racial or sexual harassment. The law draws a distinction between harassment and harassment that is based on a plaintiff's protected status.[69] The Court holds then that none of these episodes can go to establish that Plaintiff's was a hostile work environment. As for the rest of the proof adduced by Plaintiff, the Court holds that none of these incidents had the effect of unreasonably interfering with plaintiff's work performance and creating an objectively intimidating, hostile, or offensive work environment. Plaintiff cites evidence that can best be characterized as isolated offensive utterances,[70] inadmissible hearsay concerning other employees' relationships,[71] and otherwise not suggestive of harassment

---

[67] *Bowman v. Shawnee St. Univ.*, 220 F.3d 456, 463 (6th Cir. 2000).

[68] *Howard v. Bd. of Educ. of Memphis City Schs.*, 70 F. App'x 272, 282 (6th Cir. 2003).

[69] *Id*. (citations omitted).

[70] *Clay*, 501 F.3d at 706 ("[T]he incidents complained of amounted to 'mere offensive utterances,' which are not actionable under Title VII.") (citation omitted).

[71] *Hartsel v. Keys,* 87 F.3d 795, 799 (6th Cir. 1996) ("[H]earsay evidence may not be considered on a motion for summary judgment."). It is true that a statement is not hearsay if "offered against an opposing party and . . . made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(D). However,

aimed at Plaintiff on the basis of her gender or race.[72]  Plaintiff has proven only a handful of sporadic

and intermittent episodes spread over the twelve years she worked for Defendant, many occurring

years before her termination.[73]   Under the totality of the circumstances, Plaintiff has not adduced

proof to show that a reasonable person could find the work environment to be objectively hostile.

Therefore, even on the merits, the Court concludes that Defendant is entitled to summary judgment

on Plaintiff's hostile work environment claim.

## CONCLUSION

The Court concludes that Plaintiff has not her burden to demonstrate that triable issues

remain on her claims of unlawful discrimination.  Therefore, Defendant's Motion for Summary

Judgment is **GRANTED**.

**IT IS SO ORDERED.**

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: September 19, 2012.

---

Plaintiff has not attempted to meet her burden to make this showing.  Fed. R. Civ. P. 56(c)(2), comment note 2010 amendments ("The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated. There is no need to make a separate motion to strike.").

[72] *Baugham v. Battered Women, Inc.*, 211 F. App'x 432, 439 (6th Cir. 2006) ("Harassment does not arise . . . simply because the words used have sexual content or connotations.") (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).

[73] *Weatherby v. Fed. Exp.*, 454 F. App'x 480, 492-93 (6th Cir. 2012) ("The infrequency of the uncomfortable or unwelcomed incidents experienced by Plaintiff . . . do not rise to the level required to sustain a hostile work environment claim at the summary judgment stage.").